DAVID O. DRAKE, ESQ. (USB# 0911)
6905 South 1300 East #248, Midvale, UT 84047
(801) 601-9049

JEFFREY A. BRONSTER, ESQ. (JB/2620)
17 Wendell Place, Fairview, New Jersey 07022
(201) 945-2566

---

### IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF UTAH

---

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 2:23-cr-00010-HCN |
| vs. | DEFENDANT MOORE'S MOTION TO DISMISS THE INDICTMENT |
| PLASTIC SURGERY INSTITUTE OF UTAH INC., et al., | Judge Howard C. Nielson Jr. |
| Defendants. | ORAL ARGUMENT REQUESTED |

---

*Count One must be dismissed because the CDC lacked the authority to promulgate the requirements that defendant Moore is charged with violating*

*Count One must be dismissed because the documents necessary to obtain a conviction fail to comply with the federal Paperwork Reduction Act, and must therefore be suppressed.*

*Counts Two and Three must be dismissed because the property that the defendant is accused of converting did not belong to the federal government at that time*

*The Government should be barred from presenting its theory as to the value of the vaccine reporting cards, which does not comply with any of the statutory criteria for the calculation of loss.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT..................................................................... 1

LEGAL ARGUMENT.............................................................................. 3

POINT I

THE CDC LACKED AUTHORITY TO PROMULGATE
THE REQUIREMENTS THAT DEFENDANT MICHAEL
MOORE IS CHARGED WITH VIOLATING, AND
COUNT ONE MUST THEREFORE BE DISMISSED................................. 3

    A. The Role of the CDC in this Prosecution..................................... 3

    B. The Eviction Moratorium.................................................... 5

    C. The Raimondo Decision and Administrative Law....................... 7

        1. The  Passing of the APA.................................................... 7

        2. The Chevron Decision........................................................ 8

        3. The Effect of Raimondo...................................................... 11

    D. The CDC's Lack of Authority............................................... 12

POINT II

THE GOVERNMENT'S FAILURE TO COMPLY WITH
THE PAPERWORK REDUCTION ACT REQUIRES
SUPPRESSION OF THE EVIDENCE NEEDED TO PROVE
COUNT ONE, WHICH ACCORDINGLY MUST BE DISMISSED........... 15

POINT III

COUNTS TWO AND THREE OF THE INDICTMENT MUST BE
DISMISSED BECAUSE OF THE GOVERNMENT'S INABILITY
TO PROVE AN ESSENTIAL ELEMENT OF THE OFFENSE ................. 23

                                                                                            Page

        POINT IV

        THE CDC'S COMPUTATION OF LOSS SHOULD BE
        STRICKEN FROM THE INDICTMENT, AND THE
        PROSECUTION SHOULD BE BARRED FROM
        PRESENTING ANY ARGUMENT IN SUPPORT OF IT
        AT OR AFTER TRIAL..................................................................................      30


        CONCLUSION.........................................................................................................      34

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

*Ala. Ass'n of Realtors v. HHS,*
  594 U.S. 758, 141 S.Ct. 2485, 210 L.Ed.2d (2024) .................................................   5, 6

*Borman v. United States,*
  262 F. 26 (2d Cir. 1919)...............................................................................................   26

*Chevron U.S.A. Inc. v Natural Resources Defense Council Inc.,*
  467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)...........................................   7-11

*Loper Bright Enters. v. Raimondo,*
  - - U.S. - -, 2024 U.S. LEXIS 2882 (2024)................................................................   7, 10-11

*Perez v. Mrtg. Bankers Ass'n,*
  575 U.S. 92 135 S.Ct. 119, 191 L. Ed. 2d 186 (2015)............................................   11

*United States v. Anderson,*
  45 F. Supp. 943 (D. Cal. 1942)...................................................................................   26

*United States v. Chisum,*
  502 F.3d 1237 (10th Cir. 2007), *cert. denied,*
  552 U.S. 1211 (2008)...................................................................................................   18

*United States v. Gross,*
  626 F.3d 289 (6th Cir. 2010)......................................................................................   18

*United States v. Hatch,*
  919 F.2d 1394 (9th Cir. 1990)....................................................................................   18

*United States v. Hartec Enterprises, Inc.,*
  967 F.2d 130 (5th Cir. 1992)......................................................................................   26-28

<u>Page</u>

*United States Morton Salt Co.,*
   338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950) ....................................... 8

*United States v. Robie,*
   166 F.3d 444 (2nd Cir. 1999)..................................................................... 28, 29

*United States v. Sasser,*
  974 F.2d 1544 (10th Cir. 1992), cert. denied,
  506 U.S. 1085 (1993)............................................................................... 18-19

*United States v. Smith,*
  866 F.2d 1092 (9th Cir. 1989).................................................................. 18

## **PRELIMINARY STATEMENT**

This prosecution is the first of its kind in the United States. The Government makes a valiant effort to manipulate traditional theories of fraud and criminality to fit some of the complex issues arising out of the Covid-19 pandemic. It is therefore not surprising that case raises issues of first impression. This is not a traditional indictment alleging the defrauding of the government for the purpose of profit; it is more an allegation of "fraud" through the frustration of the CDC's intent in putting a vaccination plan into action. While such a theory is not unprecedented, its use is understandably rare.

In Point I, the defendant will argue that Count One of the Indictment must be dismissed because of the illegality of the CDC plan that Dr. Moore is charged with violating. He maintains, supported by decisions of the United States Supreme Court, that the CDC far exceeded its authority, and that the conspiracy to defraud claim asserted in Count One therefore cannot be sustained.

In Point II, the defendant will argue that the CDC engaged in violations of the Paperwork Reduction Act, and that such violations require the suppression of documentary and testimonial evidence without which the Government cannot hope to even establish a prima facie case under Count One.

Counts Two and three relate to theft of government property, with one count being a substantive charge and the other being a conspiracy charge. In Point III the defendant will argue that the property in question - - the Covid vaccine and the vaccination record cards obtained by Dr. Moore - - were, at the relevant times, the property of the State of Utah rather than the federal government, and that the counts must accordingly be dismissed.

In Point IV the defendant will demonstrate that even if theft of property counts are permitted to go forward, the valuation in the Indictment is fatally flawed, and simply cannot be sustained under any reasonable interpretation of the evidence, even when viewed in the light most favorable to the Government. The defendant therefore is seeking to strike that valuation from the Indictment, and to prohibit the Government from arguing it either at trial or at any hypothetical future sentencing.

## POINT I

## THE CDC LACKED THE AUTHORITY TO PROMULGATE THE REQUIREMENTS THAT DEFENDANT MICHAEL MOORE IS CHARGED WITH VIOLATING, AND COUNT ONE MUST THEREFORE BE DISMISSED

The primary governmental role in regulating public health matters lies with the states, acting within their general police powers.[1] While the federal government does have a role, it is a specific rather than a general one, and is limited to those powers granted in the Constitution. The criminal charges brought by the federal government against Dr. Moore are based on actions by the Department of Health & Human Services ("HHS") and the Centers for Disease Control ("CDC") that exceed that constitutional authority, and hence the charges cannot stand.

A. **The Role of the CDC in this Prosecution**

According to the Indictment, the  CDC and HHS "developed rules and protocols" for the administration of the Covid vaccine ("the Vaccine").[2] But the Indictment lacks the specificity to determine what those rules and protocols were,

---

[1]  *See* Elizabeth Y. McCuskey, *Body of Presumption: Health Law Traditions and the Presumption Against Preemption*, 89 TEMPLE LAW REV. 95, 113-20 (2016).

[2] Whether or not the Covid vaccine even meets the definition of a vaccine was called into question by a Ninth Circuit decision. *Health Freedom Def. Fund, Inc. v. Carvalho*, - - F.4th - -, 2024 U.S. App. LEXIS 13910 (9th Cir. 2024). However, that issue is beyond the scope of this brief, and Defendant will concede that it is a vaccine *only* for the limited purpose of this particular motion.

although they constitute an element of the necessary proofs. What the Indictment implies is that the CDC came up with a plan that it then imposed on states and medical providers. But the source of its authority to do so is never explained.

It bears noting at the outset that the CDC is not a regulatory agency, but rather an advisory one. It does purportedly have *certain* regulatory powers (*infra*). But even the United States government, in a publication made available by the National Institute of Health,  acknowledges the limitations of CDC authority under the currently- existing scheme:

> The Centers for Disease Control and Prevention (CDC) exercised broad regulatory authority throughout the COVID-19 pandemic, with many of its actions challenged in, or even blocked by, the courts. The committee believes that the CDC should be afforded ample legal authority to carry out its mission using evidence-based measures to reduce the interstate or international spread of infectious diseases. This would require legal reforms, including modernizing the Public Health Service Act of 1944 (PHSA), which was enacted well before major societal changes—including globalization—that can amplify the threat of rapidly moving infectious diseases.

See *Improving the CDC Quarantine Station Network's Response to Emerging Threats*, Ch. 6, National Academies of Sciences, Engineering, and Medicine, *et als*. (2022).

HHS has sometimes cited as a source of statutory authority the following section of 42 USC § 264:

-4-

> (a) Promulgation and enforcement by Surgeon General. The Surgeon General, with the approval of the Administrator [Secretary], is authorized to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession. For purposes of carrying out and enforcing such regulations, the Surgeon General may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary.

Although the statutory authorization is given to the Surgeon General, he has delegated that authority to the CDC pursuant to C.F.R. § 70.2. The phrase "such regulations as in his judgment are necessary" would seem to suggest broad, almost unlimited discretion; but that is not the case.

## B. **The Eviction Moratorium**

In *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 141 S.Ct. 2485, 210 L.Ed.2d (2024), the Supreme Court considered a nationwide moratorium on the eviction of certain tenants in counties with high levels of Covid-19. Although HHS defended the moratorium on the basis of its authority under 42 USC § 264, the Supreme Court disagreed, noting: "It strains credulity to believe that this statute grants the CDC the sweeping authority it asserts." 594 U.S. at 760. The Court did not dispute that Congress *could have* authorized such an action by the CDC, but such approval "has not happened." *Id*. at 759-60. Despite the fact that Covid had been declared a

national emergency, the CDC still lacked the authority to exercise power that had not

been granted to it by Congress.

Because of its implications to the HHS/CDC actions at the heart of the criminal

charges against Dr. Moore, the details of the Supreme Court's holding in *Ala. Ass'n*

*of Realtors* merits quotation here at significant length. The following paragraphs go

to the very heart of the matter:

> The applicants not only have a substantial likelihood of success on
> the merits—it is difficult to imagine them losing. The Government
> contends that the first sentence of §361(a) gives the CDC broad
> authority to take whatever measures it deems necessary to control the
> spread of COVID-19, including issuing the moratorium. But the
> second sentence informs the grant of authority by illustrating the
> kinds of measures that could be necessary: inspection, fumigation,
> disinfection, sanitation, pest extermination, and destruction of
> contaminated animals and articles.

*Id*. at 763. The Court went on to state:

> Even if the text were ambiguous, the sheer scope of the CDC's
> claimed authority under §361(a) would counsel against the
> Government's interpretation. We expect Congress to speak clearly
> when authorizing an agency to exercise powers of vast economic and
> political significance . . . . That is exactly the kind of power that the
> CDC claims here . . . .
>
> Indeed, the Government's read of §361(a) would give the CDC a
> breathtaking amount of authority. It is hard to see what measures this
> interpretation would place outside the CDC's reach, and the
> Government has identified no limit in §361(a) beyond the
> requirement that the CDC deem a measure "necessary" . . . . This
> claim of expansive authority under §361(a) is unprecedented . . . .

*Id*. at 763-65 [emphasis added, internal quotation marks and citations omitted].

The court's rejection of the CDC interpretation, *even if the statute was deemed to be ambiguous*, was a sign of what was to come. The limitations on the CDC's authority are now even clearer after the recent decision in *Loper Bright Enters. v. Raimondo*, - - U.S. - -, 2024 U.S. LEXIS 2882 (2024).

## C. <u>The Raimondo Decision and Administrative Law</u>

In 1984, the Supreme Court dramatically changed the regulatory landscape of the country. Although it is unlikely that the justices who decided *Chevron U.S.A. Inc. v Natural Resources Defense Council Inc*. meant to usher in the dramatic overhaul in administrative jurisprudence that followed, the decision began a juridical revolution that saw the court system become subservient to agencies of the executive branch.[3] It is unlikely that any agency has taken greater advantage of this realignment of traditional constitutional power than the CDC. Now, forty years later, the Supreme Court has been forced to deal with *Chevron's* unintended consequences, in a decision that reclaims for the judicial branch the role that the Founders intended for it.

### 1. <u>The  Passing of the APA</u>

The abuse of administrative power is not a new threat. Almost 80 years ago Congress passed The Administrative Procedure Act ("the APA") with a single

---

[3] *Chevron U.S.A. Inc. v Natural Resources Defense Council Inc*., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

overriding purpose: to act as "a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *United States v. Morton Salt Co.*, 338 U.S. 632, 644, 70 S.Ct. 357, 94 L.Ed. 401 (1950). The gravity of the threat presented is reflected in the fact that Congress actually found it necessary to codify a basic legal concept: that a court reviewing an administrative decision "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and or applicability of the terms of an agency action." 5 U.S.C. § 706. In other words, legal decisions are made by judges, not by bureaucrats.

For 36 years, courts implemented the APA by doing what they had always done: serving as the ultimate interpreter of legislative intent determining the boundaries of congressional delegations of authority. While a court could certainly *consider* the judgment of a regulatory agency, it had no obligation to *defer* to that judgment. As had always been the case, the intent of the APA was that courts were to continue relying on their own judgment, a function that had always been the very essence of the American judicial system.

### 2. The Chevron Decision

In 1984, the Supreme Court was called upon to rule on a somewhat obscure question of law: the interpretation of the term "stationary source" as used in the Clean

Air Act. At issue was an EPA regulation treating "all pollution-emitting devices within the same industrial grouping" as though they were part of a single "bubble." *See, Chevron, supra*, 467 U.S. at 840. In deciding in favor of the EPA, the court took a step off of the well-worn path of interpreting legislative intent.

The court started with the fundamental concept that if Congress addresses an issue directly, such that its intent is clear from the legislation itself, an administrative regulation or interpretation that deviated from that intent was void. That much of the court's ruling was compelled by the Constitution itself, and was a necessary safeguard to the constitutional authority granted to the legislative branch.

The court then turned to the question of what would happen when legislation was either ambiguous or simply silent on a matter under regulatory consideration. In the normal course the appropriate agency would regulate based upon its interpretation of the legislative intent. But what impact did that interpretation have if a regulation was subsequently challenged through a lawsuit? Under the APA, which had codified a legal concept that had stood for more than a century, the deciding court was not required to give any deference to the agency's interpretation of congressional intent. By constitutional fiat, the law was to be decided by judges, not regulators. And yet, with no attempt whatsoever to reconcile its decision with the APA, the *Chevron* court abandoned all precedent.

The Supreme Court went on to hold that if the regulatory agency's interpretation of the law  was "a permissible construction of the statute" - - not the only possible construction, not even the most reasonable construction, but simply one of however many "permissible" constructions there might be - - the courts had to defer to the agency. *Chevron*, *supra*, fn. 11. There was nothing new in a court giving *consideration* to an agency's interpretation, or even going so far as to give it "considerable weight." But *Chevron* announced a new rule of law, one found nowhere in the APA, and in fact wholly inconsistent with the APA: that in filling the statutory "gaps" that were created when Congress did not address a specific issue, the courts were required to defer to the agency, even if the Court disagreed with the agency's interpretation.

Some legal scholars believe that the *Chevron* court neither foresaw nor intended the sea change in regulatory jurisprudence that resulted from the decision.[4] As more and more cases came before the courts, the concept became more deeply imbedded that in the case of ambiguity or even mere silence on a particular issue in legislation, the interpretation of the regulatory agency was entitled to deference. Courts were no longer to decide what was correct, only what was "reasonable."

---

[4] See *Raimondo, supra* at *41, *citing* T. Merrill, The Story of Chevron: The Making of An Accidental Landmark, 66 ADMIN. L. REV. 253 (2014).

-10-

3. **The Effect of Raimondo**

Almost a decade ago, some members of the Court were already sharply criticizing the *Chevron* test, noting its patent inconsistency with the APA. *See Perez v. Mrtg. Bankers Ass'n*, 575 U.S. 92, 109, 135 S.Ct. 119, 191 L. Ed. 2d 186 (2015) (Scalia, J., concurring in judgment). Finally, in June of this year, the court officially announced what had already become apparent: that "ambiguity [in a statute] is simply not a delegation of law-interpreting power." *Raimondo, supra* at *43. The court went on to expressly overrule *Chevron*, restoring the very concept that the APA was intended to codify in the first place: that courts interpreting congressional intent should rely on their *own* interpretation of that intent, even if it conflicts with that of a regulatory agency.

The *Chevron* doctrine has not merely been wounded; it is dead and buried. In deciding on the issue of legislative ambiguity, the Supreme Court could not have been any *less* ambiguous:

> *Chevron* has proven to be fundamentally misguided . . . . For its entire existence, *Chevron* has been a rule in search of a justification . . . if it was ever coherent enough to be called a rule at all.

*Raimondo, supra* at *54-55 [citations and internal quotation marks omitted].  With its hands untied by the overruling of *Chevron* and the reinstatement of the original intention of the APA,  the Court must now turn its attention to how this rule of law

-11-

impacts the case before it. The Court will now be asked to invalidate the CDC regulations at the heart of this prosecution - - regulations that perverted congressional intent and undermined constitutional principals - - and to accordingly dismiss the charges against Dr. Moore.

### D. **The CDC's Lack of Authority**

Returning to the Indictment in this case, Count One alleges a conspiracy by the defendants to impede, impair, obstruct, and defeat "the lawful government functions of the CDC in administering authorized COVID-19 vaccines and COVID-19 Vaccination Record Cards through approved vaccine distributing entities." By virtue of this wording, the Government itself has acknowledged that for the defendant to be guilty, the CDC requirements must be "lawful." Indeed, it would be difficult to imagine how the Government could ever argue otherwise.

As discussed earlier in this brief, under our constitutional system law-making is the province of the Legislative Branch, and agencies of the Executive Branch have only such authority in that area as is statutorily granted to them by Congress. And, as recent Supreme Court decisions have reflected, such grants of authority are to be narrowly interpreted; the mere existence of a statutory ambiguity or legislative silence on a specific issue does not operate to give the Executive Branch broad power to regulate matters that fall within the gaps.

-12-

The CDC plan that is the subject of the Indictment is a massive abuse of the limited regulatory power of that agency, even with the powers delegated to it by the Surgeon General. Indeed, both the Surgeon General and HHS itself lack the statutory authority to promulgate such a plan. A discussion of all of the various ways that the CDC exceed its authority is beyond the scope of this discussion; the defendant will focus on those that most directly demonstrate why Count One must be dismissed.

Preliminarily, it should be noted that even the Indictment does not allege that a single person was deprived of being vaccinated because of Dr. Moore. Taking all of the Government's allegations as true for the limited purpose of this discussion, it has not alleged that there was ever a shortage of vaccine for people who wanted it because of Dr. Moore. Nor did Dr. Moore through his actions deprive even a single one of his patients of the ability to be vaccinated. As the Government's own evidence corroborates, none of the people who received vaccination cards from Dr. Moore ever *wanted* to be vaccinated. What the defendant did was at their request, and was consistent with their own wishes.

The only real issue, then, is Dr. Moore's purported submission to a state agency of vaccine information relating to his patients that was not truthful. It is particularly in regard to this requirement that the CDC most notably exceeded any authority granted to it by Congress.

-13-

The information-reporting to the state served no necessary purpose. What it in fact did is create a *de facto* "database" of people who could be discriminated against, *i.e.*, all those as to whom vaccinations had not been reported. The Court can take judicial notice that different agencies in different states through different means put social, educational, and employment restrictions on those who were not vaccinated. The CDC requirement of reporting vaccinations to the state was an easy, albeit unconstitutional method of identifying those who for religious, ethical, medical, or other reasons relating to personal choice and personal liberty chose not to be vaccinated. Nowhere in any piece of legislation ever passed by the Congress of the United States has HHS or the CDC been granted such rule-making power.

In summary, the CDC did not have the statutory power to require Dr. Moore to vaccinate his patients, or to require him to assist in the creation of a state database of those who chose to remain unvaccinated. What the Government's motives were in creating the vaccination plan are a subject of debate even today. Some believe that it was a good faith effort to deal with a health crisis; others believe that the Government had other motives in promoting the wide-scale use of a potentially dangerous vaccine that had escaped the usual rigorous testing process because of public fear. But this motion is not about motives, it is about law. And under the law, the CDC lacked the necessary authority, and Count One must be dismissed.

-14-

**POINT II**

**THE GOVERNMENT'S FAILURE TO COMPLY WITH THE PAPERWORK REDUCTION ACT REQUIRES SUPPRESSION OF THE EVIDENCE NEEDED TO PROVE COUNT ONE, WHICH ACCORDINGLY MUST BE DISMISSED**

In 1980 Congress passed the Paperwork Reduction Act ("PRA"), which was later amended in 1995. The PRA requires that an information-collection form be subjected to a regulatory approval process before it can be used to gather information from the public. A failure to abide by the PRA carries consequences. In the present case those consequences should be the suppression of the use, or even the reference to documentary evidence  that violated the PRA.

44 U.S.C. § 3507(a) sets out a fairly rigorous process that must be abided by for a form to receive approval for distribution:

(a) An agency shall not conduct or sponsor the collection of information unless in advance of the adoption or revision of the collection of information—

(1)     the agency has—

(A)     conducted the review established under section 3506(c)(1) [44 USCS § 3506(c)(1)];

(B)     evaluated the public comments received under section 3506(c)(2) [44 USCS § 3506(c)(2)];

(C)     submitted to the Director the certification required under section 3506(c)(3) [44 USCS § 3506(c)(3)], the proposed collection of information, copies of pertinent statutory authority, regulations, and other related materials as the Director may specify; and

-15-

> (D)   published a notice in the Federal Register—
>
> > (i)      stating that the agency has made such submission; and
> >
> > (ii)    setting forth—
> >
> > > (I)      a title for the collection of information;
> > >
> > > (II)    a summary of the collection of information;
> > >
> > > (III)    a brief description of the need for the information and the proposed use of the information;
> > >
> > > (IV)    a description of the likely respondents and proposed frequency of response to the collection of information;
> > >
> > > (V)    an estimate of the burden that shall result from the collection of information; and
> > >
> > > (VI)    notice that comments may be submitted to the agency and Director;
>
> (2)   the Director has approved the proposed collection of information or approval has been inferred, under the provisions of this section; and
>
> (3)   the agency has obtained from the Director a control number to be displayed upon the collection of information.

The statute goes on to contain extensive provisions for public notice and the ultimate approval of a form.

Under 44 U.S.C. § 3502, there can be no doubt that both HHS and the CDC are subject to the PRA:

> (1) the term "agency" means any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency,

Nor can there be any doubt as to the broad range of forms that are covered by the statute, some of which apply to this case (*infra*):

> (3) the term "collection of information"—
>
> (A) means the obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format, calling for either—
>
> (i) answers to identical questions posed to, or identical reporting or record-keeping requirements imposed on, ten or more persons, other than agencies, instrumentalities, or employees of the United States; or
>
> (ii) answers to questions posed to agencies, instrumentalities, or employees of the United States which are to be used for general statistical purposes . . . .

Congress was so intent that executive agencies comply with the requirements of the PRA that it built into the statute a provision for the protection of the public, embodied in 44 U.S.C. § 3512:

> (a) Notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information that is subject to this subchapter if—
>
> (1) the collection of information does not display a valid control number assigned by the Director in accordance with this subchapter; or

-17-

(2) the agency fails to inform the person who is to respond to the collection of information that such person is not required to respond to the collection of information unless it displays a valid control number.

(b) The protection provided by this section may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto.

The "public protection" provision has rarely been raised in the context of a criminal prosecution, but such use is not without precedent, and courts have at times gone so far as to dismiss such prosecutions. See *United States v. Smith*, 866 F.2d 1092 (9th Cir. 1989); *United States v. Hatch*, 919 F.2d 1394 (9th Cir. 1990). A marked exception, however, has been made for federal tax prosecutions, with multiple courts, including the Tenth Circuit, finding that there is an independent statutory basis for tax prosecutions that renders the PRA inapplicable. *See e.g. United States v. Chisum*, 502 F.3d 1237 (10th Cir. 2007), *cert. denied*, 552 U.S. 1211 (2008); *United States v. Gross*, 626 F.3d 289 (6th Cir. 2010).[5]

There is one other relevant Tenth Circuit case which at first reading *appears* to defeat Dr. Moore's PRA argument. *United States v. Sasser*, 974 F.2d 1544 (10th Cir. 1992), *cert. denied*, 506 U.S. 1085 (1993). But the timing of that decision is

---

[5] The Tenth Circuit also denied a taxpayer's appeal in *Springer v. Comm'r*, 580 F.3d 1142 (10th Cir. 2009), *cert. denied*, 559 U.S. 1017 (2010). However, the specific grounds for the denial were that the taxpayer had waived the defense as to taxes assessed by not raising it in the tax court, and that penalties assessed did not arise out of the challenged documents, and hence the PRA was not applicable to them.

-18-

crucial. The case was decided under the PRA as it was first passed by Congress in 1980. At that time, Paragraph (b) of the statute *did not exist*.[6] It was not until 1995 that Congress strengthened the statute by adding: "(b) The protection provided by this section may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto."

The imposition of the rules attendant to the CDC vaccination scheme in general, the Government's investigation of Dr. Moore in particular, and the decision to prosecute and indict him were all part of the administrative process of agencies of the Executive Branch. This criminal action is a "judicial action relating thereto", and accordingly Dr. Moore is entitled to raise the Government's breaches of the PRA as "a complete defense, bar, or otherwise." Paragraph (b), which memorializes his right, did not exist when *Sasser* was decided, and in effect supercedes it.

¶ 17 of the Indictment alleges that providers were required to sign a CDC Covid-19 Vaccination Program Provider Agreement.[7] The Government alleges that Dr. Moore did so, and this document is critical to the Government's fraud theory in Count One. Importantly it is, by its very nature, an information-collection document.

---

[6] Solely for the purpose of preserving the issue for appeal, Defendant also maintains that *Sasser* was incorrectly decided, and should be reconsidered by the Tenth Circuit.

[7] Dr. Moore denies submitting anything to the CDC. To the best of his knowledge his dealing with the vaccine were entirely between him and the State of Utah.

-19-

To the best of Dr. Moore's knowledge and belief, he never signed a Provider Agreement that displayed a valid control number assigned under the PRA, or that informed him that he was not required to *respond* to the form unless it displays such a control number. This is an outright violation of 44 U.S.C. § 3512, and Dr. Moore is entitled to the protection of having any evidence, documentary or testimonial, as to the Provider Agreement suppressed.

The Indictment, in that same paragraph, states that Dr. Moore was required "provide a completed COVID-19 vaccination record" to each vaccine recipient. That requirement would require from him "the disclosure to third parties or the public" of information. Furthermore, the vaccine card required "answers to identical questions posed to, or identical reporting or record-keeping requirements imposed on, ten or more persons." Thus, the vaccine cards were, by statutory definition, information-collection forms.

Here again, to the best of Dr. Moore's knowledge and belief, he never authored a Vaccine Card Provider Agreement that displayed a valid control number assigned under the PRA, or that informed him that he was not required to *respond* to the form unless it displays such a control number. Furthermore, his research has failed to turn up any sample of the vaccine card form that contains that information. This is another violation of 44 U.S.C. § 3512.

-20-

Finally, Dr. Moore is not aware of any forms used for reporting patient vaccinations to the State of Utah that contained a PRA control number. The CDC *claims* that the requirement of providing such information to the State was part of its requirements as part of its master plan; thus, a PRA control number should have been required on any applicable forms, yet another violation.

As a result of the various violations, virtually all of the significant documentary and testimonial evidence that the Government seeks to rely upon must be suppressed. Without it, the Government cannot possibly hope to even establish a *prima facie* case of fraud.

Parenthetically, it bears noting that Paragraph 10 of the Indictment states that the CDC's intent - - the "frustration" of which is the very basis of Count One, being the supposed object of Dr. Moore's conduct  - - "was to make a COVID-19 vaccine available to all authorized adults in the United States who wanted to receive a vaccine." **With or without the documentary evidence referred to above, the Government has no evidence of the frustration of that intent**. The Indictment does not allege that Dr. Moore's actions created a shortage of the vaccine or frustrated its receipt by any adult who wanted it. As to Dr. Moore's own patients, by their very actions they were expressing that they *did not* want to receive the vaccine.

Paragraph 20, somewhat contradicting Paragraph 10, states that Dr. Moore committed fraud by attempting to defeat the CDC functions of "distributing and administering authorized COVID-19 vaccines and COVID-19 Vaccination Record Cards" through approved distributors.[8] *But the Government's proofs, even taken in their best light, fail to prove both*.

As noted, the Indictment does not claim that distribution and administration of the vaccine to anyone who wanted it was impeded by *anything*, much less by anything that Dr. Moore did. Furthermore, nothing that Dr. Moore did interfered with the CDC goal of distributing Vaccination Record Cards. Every patient who was vaccinated by anyone presumably received a card. What Dr. Moore allegedly did may have *increased* the universe of who received such cards, but it did nothing to interfere with the distribution of vaccine cards to those people who did receive the vaccine.

All of the foregoing demonstrates that even *with* the benefit of all of its evidence, the Government cannot hope to prove the allegations of Count One. It is therefore self-evident that *without* that evidence, which must be suppressed because of the CDC violations of the PRA, there is no excuse for the Government to burden Dr. Moore any further with this accusation, and Count One must be dismissed.

---

[8] While both "distributing and administering" apply to the vaccine itself, the second part of the sentence only alleges frustration of the distribution of Vaccination Record Cards.

### POINT III

### COUNTS TWO AND THREE OF THE INDICTMENT MUST BE DISMISSED BECAUSE OF THE GOVERNMENT'S INABILITY TO PROVE AN ESSENTIAL ELEMENT OF THE OFFENSE

Counts Two and Three of the Indictment are similar in nature, the distinction being that one charges a substantive offense, while the other charges a conspiracy to commit that offense. 18 U.S.C. § 641 states as follows:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or
>
> Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—
>
> Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.
>
> The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

The 2021 Edition of the Tenth Circuit's Criminal Patter Jury Instructions, defining the offense set out in § 641, states as follows:

> 2.31  The defendant is charged in count _____ with a violation of 18 U.S.C. section 641. This law makes it a crime to [steal] [embezzle] [convert] government property.

-23-

The defendant is accused of [stealing] [embezzling] [converting] [name property]. To find the defendant guilty of this crime you must be convinced that the government has proved each of the following beyond a reasonable doubt:

First: the [name property] belonged to the United States government [if lack of knowledge is asserted, add: It does not matter whether the defendant knew that the [name property] belonged to the United States government, only that he knew it did not belong to him.];

Second: the defendant [stole] [embezzled] [converted] the [name property] intending to put it [to his own use or gain] [to the use or gain of another] or the defendant took the [name property] knowing it was not his and intending to deprive the owner of the use or benefit of the [name property]; and

Third: the value of the [name property] was more than $1,000.

"Value" means the face, or market value, or cost price, either wholesale or retail, whichever is greater.

The substantive count of the Indictment describes the conduct that Dr. Moore and other defendants supposedly engaged in and/or conspired to engage in, alleging as follows:

. . . defendants herein, did embezzle, steal, purloin, and knowingly convert to their use or the use of another, and without authority, sold, conveyed, and disposed of a thing of value of the United States or of a department or agency thereof and of property made or being made under contract for the United States and a department or agency thereof, that is, the Centers for Disease Control and Prevention, namely approximately 1937 doses of COVID-19 vaccines and corresponding COVID-19 Vaccination Record Cards . . .

The Covid vaccine and the vaccination record cards that are the property in issue were not the property of the United States at the time that Dr. Moore acquired them; hence, these two counts cannot be sustained.

The defendant does not dispute that at one point in time the vaccine and the record cards constituted "a thing of value of the United States . . ." However, that was not the case when Dr. Moore received them. He did not receive them from the United State government or the CDC.

Pursuant to its own plan, the CDC had already distributed the items to the State of Utah (as it had to each of the 50 states). It was the State that then exercised possession, dominion, and control over them, and made the decisions as to when and to whom to distribute them. Dr. Moore dealt only with the State of Utah in obtaining the vaccine and record cards. Although he does not concede having committed a "theft" at all, as a matter of law the only possible "victim" of such an act would have been the Utah Department of Health & Human Services, not the CDC or the federal government itself.

The very first element to be proven as per the Pattern Jury Charge is that the property "belonged to the United States government." Inasmuch as the Government cannot prove something that is factually untrue, there is no basis to subject Dr. Moore to a trial on Counts Two and Three, which accordingly should be dismissed.

Defendant anticipates that the Government will try to circumvent this issue by invoking the statutory language, "or any property made or being made under contract for the United States or any department or agency thereof . . ." But the clear meaning of that

statutory language is that it refers to property that 'belongs' to the United States, even though it may still be in the process of production, or in the hands of a manufacturer with whom it has contracted. *See. e.g. United States v. Anderson*, 45 F. Supp. 943 (D. Cal. 1942). *See also Borman v. United States*, 262 F. 26 (2d Cir. 1919) [holding that contractor violated predecessor statute to 18 USCS § 641 by converting materials furnished by the government to be made into a final product].

While modern case law on point is sparse, *United States v. Hartec Enterprises, Inc.*, 967 F.2d 130 (5th Cir. 1992) is instructive. Hartec manufactured wire mesh panels under a government contract. After it was discovered that Hartec sold some of the panels to third parties, it was convicted under 18 U.S.C. § 641 for this purported theft. The company maintained that the panels were "non-conforming goods" of which the government would not have taken possession, and hence were not government property. But the statutory language, "or any property made or being made under contract for the United States" was fatal to its defense at the trial level.

The Fifth Circuit reversed, holding that the panels had not become the "property" of the United States, notwithstanding the fact that they were made with materials paid for by the government. It also rejected the argument that a contractual clause that gave the United States the right to retrieve the materials from third parties in possession of them did not render the panels the "property" of the government.

-26-

The Fifth Circuit impliedly acknowledged that reasonable persons could differ as to whether or not the panels were "government property" under the specific facts of the case. It therefore applied a principal which is implicated in this case as well: the rule of lenity:

> This is also a paradigmatic case for application of the rule of lenity. The rule of lenity compels us to construe ambiguous criminal statutes in favor of lenity . . . . The rule promotes fair notice of prohibited conduct and reduces the likelihood that unintentionally criminal conduct will be penalized . . . .
>
> Although the rule does not require that we give the statute its narrowest construction . . . we find that under the facts now before us, the coupling of the title vesting provision with its inconsistent interpretations in the courts and § 641 did not provide [the defendant] with notice that he could be criminally liable for sale of the wire mesh panels.

967 F.2d at 133. An application of that very same principal is appropriate here as well as to Dr. Moore.

Although the CDC did not supply the materials used to manufacture the Covid vaccine, it is certainly true that it was manufactured for the CDC pursuant to a government contract. *But the CDC then divested itself of the vaccine and the record cards by giving them to the states, which then determined when, where, how, and to whom to distribute them.*

At the very least, the situation creates an *ambiguity* as to the "ownership" of the vaccine and record cards, similar to the ambiguity that existed in *Hartec*. Dr.

-27-

Moore believed that he was receiving products that belonged to the state of Utah, not the United States government. He still maintains that his belief was correct, but at worst the situation, as in *Hartec*, was so ambiguous that "§ 641 did not provide . . . notice that he could be criminally liable" for the use that he made of the vaccine and record cards. It is therefore appropriate to apply the rule of lenity, just as the Fifth Circuit did, and to dismiss Counts Two and Three.

Interestingly, there is another parallel to *Hartec*. In that case, there was the contractual clause that allowed the government to retrieve the materials from third parties. Here, there is at least an argument that could be made on the CDC's behalf that although the vaccine/cards were no longer its property, Dr. Moore's use of them violated the provisions of the Vaccination Program Provider Agreement. **This may arguably give the CDC standing to file a civil action for breach of contract against Dr. Moore, a point that he does not concede here but does not dispute either, as it is not relevant.** But what the Government cannot do is convert that civil contract dispute into a criminal charge.

A final case that illustrates the use of the "under contract for the United States" language is *United States v. Robie*, 166 F.3d 444 (2nd Cir. 1999). The defendant worked for a company that manufactured stamps for the federal government. During the process a number of "inverted" stamps were inadvertently printed. Rather than

-28-

destroying these misprints, Robie sold them to third parties for a substantial amount of money. In denying the defendant's appeal, the court explained:

> The misprints fall squarely within the plain meaning of the statutory language. They were produced for the government solely and literally "under contract for" the Postal Service. Although as misprints they were useless to the Postal Service, it does not follow that they were not made under that agreement.

Id. at 452.

The Second Circuit determined that the misprints had been manufactured for the government and that they were the property of the government at the time that they were sold. That finding of fact was dispositive in *Robie*. But it is the paragraph *following* that one that is dispositive in this case as to Dr. Moore:

> That goods stolen were at one time made under government contract is not alone enough to establish the offense, however. Stamps lifted by a pickpocket on a city bus were once "made under contract for the Postal Service," but the theft is not a federal crime . . . .

*Ibid*. The fact that the Covid vaccine was made under government contract is not alone enough to establish the offense charged here. Even if the CDC chooses to characterize Dr. Moore as "the pickpocket on the city bus," it cannot convict him of a theft of CDC property that no longer belonged to the CDC.

Based on all of the foregoing, the defendant respectfully submits that Counts Two and Three of the Indictment must be dismissed.

-29-

## POINT IV

## THE CDC'S COMPUTATION OF LOSS SHOULD BE STRICKEN FROM THE INDICTMENT, AND THE PROSECUTION SHOULD BE BARRED FROM PRESENTING ANY ARGUMENT IN SUPPORT OF IT AT OR AFTER TRIAL.

Assuming *arguendo* that some or all of the counts in the Indictment survive this dismissal motion, the defendant submits that the Government's calculation of loss in the Indictment should be stricken, and that it should be barred from arguing its theory either at trial or at any hypothetical sentencing.

Count One of the Indictment presents a chart showing the value of the Covid vaccine obtained by Dr. Moore as $28,028.50. That valuation is based on the CDC's actual cost, and for the limited purpose of this motion the defendant will not contest it. Count Three, however, contains a second chart that is absurd on its face.

The Indictment claims that Dr. Moore obtained "approximately 1937 doses of COVID-19 vaccines and corresponding COVID-19 Vaccination Record Cards." It goes on to value the record cards at $50 apiece, for a total of $96,850, for a total claimed loss of $123,878.50.[9] The valuation of the record cards is outrageous at best, and blatant governmental abuse at worst.

---

[9] Unlike its approach to the vaccine itself, the Indictment makes no mention whatsoever of its actual cost of obtaining the vaccine record cards.

As quoted above, the Tenth Circuit Pattern Criminal Jury Instruction for 18 U.S.C. § 641 defines the term "value" as meaning the greatest of the following alternatives: face value, market value, or cost price (either wholesale or retail). It goes without saying that the pre-printed index card that constituted a vaccination record card did not have a cost price of $50 apiece. Nor did the card have such a "face value"; indeed, it had *no* face value, as it was never for sale to anyone, either doctor or patient. The only possible theory the government can therefore be advancing is that $50 represents the "market value" of the card.

If one can ignore the bad faith inherent in the CDC's position, it might be possible to at least give the government credit for creativity. Its theory, such as it is, consists of the following chain of "logic":

- In Paragraph 22(f), the Indictment alleges that "in exchange for direct cash payments or directed donations of $50 per person per occurrence," Dr. Moore distributed vaccine cards to patients who were not vaccinated;

- In Paragraph 23(e), the Indictment identifies a specific transaction in which an alleged co-conspirator of Dr. Moore instructed an undercover agent to make "a $50 donation," and to provide proof of it by text;

- By using $50 as the "value" of each card, the Government is apparently positing that amount, based on the cited evidence, as its "market value."

-31-

There are a host of flaws in the Government's theory, some factual and some legal, which collectively are fatal. The following are some of the factual issues:[10]

(1) Factually, the defendants never received $50, or any other amount, from anyone; for the limited purpose of this motion, Dr. Moore will not contest that he or others requested that some, although not all, of the patients who received records cards were asked to make a donation to a registered charity that was against mandated Covid vaccines and that advocated against it;

(2) The Government does not, and factually cannot, allege that Dr. Moore had any financial interest whatsoever in the charity, and never received even one dollar for "selling" vaccine cards; the Government maintains, and for the limited purpose of this motion Dr. Moore acknowledges, that he was motivated entirely by his medical beliefs about the vaccine and his obligation, as he saw it, to his patients;

(3) Although contributions to the charity were requested, not all patients who got the cards made the donations. Aside from Dr. Moore's philosophical alignment with the charity, the making of the contributions was more of a "verification" of the genuineness of the patient's desire to avoid the vaccine than anything else.

---

[10] As to the factual issues asserted here, Dr. Moore is prepared to participate in a hearing to establish the accuracy of the asserted facts, should the Court find one or more of the issues to be dispositive. Some of the asserted facts will most likely not even be disputed by the Government.

The Government's theory is also legally flawed. That theory, to reiterate, is that Dr. Moore was selling vaccine cards at $50 apiece, thereby establishing their market value. **But there is not a single patient of Dr. Moore's who would have ever paid one penny, much less $50, to purchase a vaccine card.** Assuming, *arguendo*, that a patient was actually paying for something of value, what he was paying for was the not the receipt of a pre-printed vaccine record card. **Even under the Government's own theory, the patient would actually be paying $50 for the accommodation of Dr. Moore <u>filling out</u> the vaccine card with purported vaccination information; the patient was paying for a <u>service</u>, not a product.**[11]

The defendant acknowledges that the invalidity of the Government's theory of valuation may be more significant at a hypothetical sentencing (where the value of property would affect the guidelines range) than at trial, as proof of value is not an essential element of the crime charged. But the defendant will still be prejudiced in the eyes of the jury by the accusation of such a large "theft" of property, and there is no reason to allow the Government to make a prejudicial argument that is incorrect as a matter of law.

---

[11] It bears repeating yet again the Dr. Moore denies "selling" anything or "demanding" anything; he maintains that at most the evidence will support that the defendants sometimes requested that a patient make a charitable donation from which he received no personal benefit. The argument being made here simply assumes, for the very limited purpose of making his legal point, that the Government could establish that he was "selling" something.

## CONCLUSION

The Covid vaccine, and the ways in which government has developed it, approved it, distributed it, and even mandated it, has caused cultural and political rifts that continue to be felt even after the end of the pandemic. This motion cannot heal those rifts or answer the political or ideological issues behind them. Instead, it presents conventional legal arguments, supported in some cases by the holdings of the United States Supreme Court itself.

From the outset, the Government has been trying to fit a square peg into a round hole. It believes that Dr. Moore has done *something* wrong, but has been unable to charge a crime that fits the conduct. *Had Dr. Moore committed the acts he is accused of for the sake of profit, this motion would most likely never have even been filed*. But even the Government must reluctantly acknowledge that such is not the case. It knows full well that whatever Dr. Moore did, he did based on ideology and his sense of professional ethics. The Government need not *agree* with Dr. Moore's ideology, but it cannot in good faith deny its role in this case.

Based on all of the arguments made above, Dr. Moore urges the Court to find that the Government has failed in its attempts to fit a criminal charge to his conduct, and to dismiss the Indictment in its entirety.

-34-

Respectfully submitted,

/s/  Jeffrey A. Bronster
JEFFREY A. BRONSTER, ESQ.
(JB/2620)
17 Wendell Place
Fairview, New Jersey 07022
(201) 945-2566
*jbronster@bronsterlaw.com*


/s/  David O. Drake
DAVID O. DRAKE, ESQ.
(USB# 0911)
6905 South 1300 East, #248
Midvale, UT 84047
(801) 601-9049
*sirdrake2033@gmail.com*

*Attorneys for Defendant Michael
Kirk Moore Jr.*


Dated:  July 10, 2024