**JEFFREY A. BRONSTER, ESQ.**
ATTORNEY AT LAW
17 WENDELL PLACE
FAIRVIEW, NEW JERSEY 07022

———

(201) 945-2566

Facsimile: (201) 945-2688
email: jbronster@bronsterlaw.com

MEMBER OF NEW JERSEY & NEW YORK BAR

November 7, 2024

Honorable Jared C. Bennett
United States District Court
351 South West Temple
Salt Lake City, UT 84101

      Re:    United States v. Plastic Surgery Institute
               of Utah Inc., et al.
               Case No. 2:23-cr-00010-HCN

Dear Judge Bennett:

      Please accept this submission on behalf of Dr. Michael Moore in advance of tomorrow's revocation hearing. The Government's arrest of Dr. Moore, and its attempt to keep him incarcerated for the next eight months pending trial, is a massive over-reaction to a situation that is nothing more than a simple misunderstanding. As will be discussed, it is questionable whether or not Dr. Moore has violated the Court's release order at all. But even if so, his violation was an innocent one which provides no basis for the draconian relief the Government is asking for.

      The documentary evidence that the Government has provided shows that some of the defendants, including Dr. Moore, have been communicating with each other via text on a application known as "Signal," which according to the available statistics currently has more than 70 million users. The application provides for private and secure communication like many other similar applications, such as the better-known WhatsApp program, which presently has 2.9 *billion* users.

The Government's arrest of Dr. Moore (and defendant Anderson) is based on the assertion that the texts violate the conditions of Dr. Moore's pre-trial release order. Under the "Additional Conditions of Release," provision 6(c) is checked off. First, Paragraph 6(c) states the following in pre-printed language:

> The defendant must . . . (c) avoid all contact, directly or indirectly, with any person who is or may be an alleged victim, potential witness and/or codefendant in the investigation or prosecution. List of persons to be provided to the defendant by the Government.

Then, after that form language, the Order contains the following typed-in statement: "Defendants will not talk about this case amongst themselves." The defendant and the Government apparently disagree as to what the Court actually meant by adding that language. But for the purpose of this motion what matters is not what the words *intended,* but what they reasonably *conveyed*.

### A. The 6(c) Pre-Printed Language

Paragraph 6(c) is an important provision. On its face, its intention is to prevent a defendant from interfering with the trial by tampering with witnesses. Logically, it prohibits contact both with "potential witnesses" in general, and with victims of the alleged offense in particular. The Government is certain to argue that the phrase "potential witness and/or codefendant" creates a bar in and of itself to precisely the kind of communication with other defendants engaged in here. But that interpretation does not stand up to scrutiny of the statutory intent, nor is it consistent with the relevant constitutional considerations.

18 U.S.C. § 3142 only allows pretrial detention in certain limited circumstances, specifically, if there is a substantial risk of flight or if release would endanger others. In all other cases, such as this one, the Court is required to release a defendant "subject to the least restrictive" conditions that

would reasonable assure the defendant's appearance, and that would assure the safety of others and the community. 18 U.S.C. § 3142(c)(1)(B). The statute then goes on to provide a list of conditions that may be imposed for that purpose. Subsection (v), upon which Paragraph 6(c) of the pre-printed release Order is based, permits the inclusion of a provision that the defendant "avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense."

Notably, the pre-printed Paragraph 6(c) (which is not a statutorily-approved form, and is in fact nothing more than an administratively-created convenience), goes *beyond* the statutory authorization by adding the "and/or codefendant" language. Given that 18 U.S.C. § 3142(c)(1)(B) appears to be a comprehensive list of the conditions the Court may include, the additional codefendant language in the form is not appropriate or enforceable in any case. But even if the list is *not* deemed to be all inclusive, it defies reason - - not to mention law - - that such a restriction would be imposed on the defendant in *every* case, simply because the Court checks off a box that is necessary to protect against the tampering with *witnesses*.

There is a perfectly reasonable alternative interpretation of the pre-printed codefendant language, and it is the meaning that defendant maintains is the correct one. As a reminder, the language prohibits contact with "an alleged victim, potential witness and/or codefendant in the investigation or prosecution." As a simple exercise in the English language, the prohibition must be read as prohibiting contact with a "potential witness" or with a "potential codefendant." This interpretation is consistent with the overall intent of the paragraph. Actual defendants are people already charged; they are already defending the case, and already have interests aligned with each other. "Potential codefendants," on the other hand, are people not yet charged, people whom a hypothetical defendant might very well want to tamper with for their own benefit.

All of this is consistent with the undeniable legal fact that a pre-printed form cannot preempt the right of a criminal defendant to prepare and present a defense. It is natural, typical, and to be expected that defendants will plan their defense with some amount of cooperation and joint effort. It is inconceivable that Government could have any legitimate interest in preventing them from doing so; nor is it conceivable that a defendant's constitutional right to prepare a defense could be so easily frustrated as the Government seems to be suggesting.

**This is not to say that there is no governmental interest in preventing codefendants from conspiring to commit further crimes or from tampering with witnesses.** The government certainly has the right, and arguably even has the obligation, to prevent such conduct. But in a case such as this one where there is not a shred of evidence of an attempt by any defendant to do anything improper, it is over-reaching by a constitutional mile to prohibit codefendants from working together on a trial defense simply as a prophylactic measure.

### B. The 6(c) Typed Insert

The Government will undoubtedly argue that even if the foregoing is all correct, the inserted provision that was not part of the original form clarifies an absolute restriction of contact between the codefendants. As noted, that insert reads, "Defendants will not talk about this case amongst themselves." On its face, this was neither intended as, nor does it act as, a complete prohibition against *any* communication between defendants. Nor is the only reasonable interpretation of the language the constitutionally questionable one that the Government suggests: that the Court was somehow issuing a blanket prohibition against the defendants working together on a trial defense.

In March 2023, every one of the defendants became a party to a Joint Defense Agreement. By its very nature that agreement was intended to allow and to promote cooperation between the

various defendants. Dr. Moore did not understand the Court's Order as being intended to over-ride the right to prepare a defense. He understood it as being intended to prevent the defendants from taking exactly the type of actions contemplated by 18 U.S.C. § 3142(c)(1)(B), actions that would in some way unlawfully obstruct the prosecution or tamper with witnesses. In the end, only the Court can know what its true intention was, but it seems inconceivable that the Court ever intended to quash the constitutional right of the defendants to simply work together to defend themselves at trial.

### C. The Communications Between Defendants

With the foregoing in mind, it is of course important to look at the texts that were actually exchanged between the defendants. The Court would most likely have little tolerance for any communication that suggested illegal conduct or witness tampering, and that is exactly as it should be. But the texts provided by the Government do not even arguably come close to such conduct.

The first text provided by the Government shows that it was circulated among a group consisting of three members, each of whom is a defendant in this case. Notably, the heading of the communication reads, "Legal Defense." The text, addressed to "Kris" and "Kari" reads as follows:

> As you both know we have a hearing tomorrow about our motion to dismiss (MTD). It would be beneficial if you and your attys would be there.
>
> Kari, can u speak to my attys and answer some of their questions regarding how we obtained the vials and cards, who we contacted, who delivered them etc? That's a part of the process I was not really involved in
>
> Kris, do you know of any of our patients that would be willing to testify as to tue [sic] necessity of them getting a card that permitted them to stay emp [sic] …

Kari Burgoyne responded with the following texts: "Yes I will work on it. Bethany last person kidney transplant." Dr. Moore responded with the statement, "I will have Jeff reach out to you." The name "Jeff" is presumably a reference to the undersigned, one of Dr. Moore's attorneys. Far from being conspiratorial, or from promoting any effort to tamper with evidence, this was a straightforward attempt to work towards building a defense - - an effort that contemplated the participation of attorneys and defendants, consistent with the joint defense agreement.[1]

Dr. Moore was not engaged in a surreptitious effort to violate what he understood to be an action prohibited by the Court. Had that been his intention, he would never have been foolish enough to include Burgoyne in the exchange, given their adversarial relationship (see fn. 1). He saw the texts as nothing more that codefendants working together to assist their attorneys to prepare a defense for trial. It never even *occurred* to Dr. Moore that such an effort would be within the contemplation of what the Court was forbidding. And especially in light of the obvious constitutional infirmities in such a broad prohibition, his confusion on that matter is easily understood.

### D. The Actions This Court is Permitted to Take

Based upon the arguments that have been made thus far, the defendant contends that there is no basis to find that he has violated the Court's order; and that even if the Court should find a technical violation, it should still be clear that the violation was innocent and unintentional. But if a violation is in fact found, the question becomes what actions may the Court take.

---

[1] In submitting these texts to the Government, Burgoyne may well have breached the Joint Defense Agreement, and the admissibility of the texts is questionable. However, the defendant will pursue that issue further when and if it becomes appropriate rather than at this hearing. It should be mentioned that Burgoyne's motives for reaching out to the Government are transparent. Aside from the obvious attempt to court favor in anticipation of obtaining a more favorable deal, Burgoyne and Dr. Moore are currently in a civil dispute of the ownership of very expensive medical equipment. Any harm that Burgoyne can do to Dr. Moore inures to both her criminal and her civil benefit.

18 U.S.C. § 3148 permits the court to revoke the release and order the detention of a defendant who violates his conditions, and to commence a contempt proceeding. Defendant will not discuss here the prospect of contempt. not because he does not recognize the seriousness of such a proceeding but because the paramount issue to be addressed at the hearing is his liberty.

In order for the court to consider the revocation of Dr. Moore's release, it must first find by clear and convincing evidence that he has violated a condition of his release, and that he is unlikely to abide by any condition or combination of conditions of his release. He respectfully maintains that neither of these criteria can be met at his hearing. As has been explained above, the inserted typed notation on the release order is subject to different interpretations, and under the circumstances of this case Dr. Moore was not acting in bad faith in believing that his conduct was permissible.

If the court truly intended the codefendant prohibition to be as broad as the Government suggests, then the defendant asks the Court to reconsider, given that it poses a clear threat to his right to prepare a defense. But even if the Court disagrees and is unwilling to reconsider, Dr. Moore respectfully submits that the court cannot take his conduct to date as meaning that he will not abide by the order after a clarification. Eeither the Court's order has not been violated at all, or at worst it has been violated inadvertently and unintentionally. In either event, depriving Dr. Moore of his freedom would be a grossly excessive response.

If the court does find a violation, the procedure then relates back to 18 U.S.C. § 3142, and the standards to be applied are the same as they would have been at the initial hearing. This means that Dr. Moore cannot be detained unless the court finds that there are no conditions that will assure that he is not a serious risk of flight, or that there were no conditions under which he will not pose a danger to the safety of others. The court did not make such findings even at the original hearing.

Nothing that has happened since that original hearing shows Dr. Moore to be a risk of flight. Dr. Moore was not arrested at the border with a fake passport in his hand; he has done nothing to indicate an intention, much less an ability to flee the jurisdiction of this Court.

Nothing has happened to cause the Court to believe that Dr. Moore presents a threat to anyone. The communications between himself and his codefendants were in furtherance of trial preparation. The texts are nothing more than an effort to coordinate between the defendants and counsel to prepare for trial. They do not reflect any danger to any person, they do not reflect any threat of witness tampering, nor did they in any other way show that Dr. Moore is a danger. Therefore, November 7, 2024efendant respectfully submits that the court lacks statutory authority to order his detention, and must release him upon such conditions as may be appropriate. As noted above, he further submits that prohibiting him from working with his codefendants to prepare for trial is not a reasonable or appropriate condition. Nevertheless, should the court clarify its intentions and stand by such a prohibition, he will abide by it scrupulously.

E. **Personal Factors Favoring Release**

As important as Dr. Moore's freedom is to him personally, there are others who will be affected by the Court's decision as well. Dr. Moore's 17-year-old son lives with him under his supervision, and his elderly mother also lives with him part-time. Both need his care and assistance. And while Dr. Moore's daughter, who is several years old than his son, no longer lives with him, she too will be greatly impacted by the loss of access to her father through his pretrial incarceration.

Virtually every defendant has a family that is impacted by what happens to him. But there are extreme factors here. Five years ago Dr. Moore's wife committed suicide, and her body was discovered by her son, who was 12 at the time. This letter will not dwell on the trauma of that event;

the court can surely appreciate for itself its effect on Dr. Moore's son, and the reasons why Dr. Moore's pretrial incarceration would work a particular partnership on the family in this case.

If Dr. Moore was accused of committing a crime while on release, the equation would surely be different. But there is no accusation here of criminal conduct, and as discussed extensively above even the allegation that he violated the court order is highly debatable. The human factors involved weigh equally with the legal factors, and both militate in favor of Dr. Moore's release.

### F. A Response to the Government's Submission

As this letter was being written, the Government filed its own submission. The undersigned has reviewed it somewhat briefly, given the time constraints on submitting this letter. The defendant will not respond to it at length, but wishes only to make two points. The first is that if and to the extent that the government wishes to rely on anything said by Burgoyne, defendant requests a hearing where she is required to testify under oath. While she may be a defendant in the case, she has obviously waived any Fifth Amendment right that she may have in connection with anything that she has discussed with the Government already. The defendant is entitled to have her cross-examined, especially given the motivations that she has the lie in order to damage Dr. Moore.

More importantly for the purposes of this letter, Dr. Moore vehemently objects to the Government's attempts to use his constitutionally protected expressions of opinion as a weapon against him to promote his incarceration. Its arguments in that regard are nothing short of a persecution of Dr. Moore for his personal and political beliefs.

The Government points in particular to a social media post in which Dr. Moore professed that his personal motto is *noli parere*, which he went on to define as "do not comply." The post goes on to elaborate that he intends to rely on his ethics, morals, and values, and is not going to let other

people tell him what he can or cannot say. **Nothing in Dr. Moore's post states, or even hints, that he does not intend to comply with orders of the United States District Court**. Whether he has expressed himself elegantly or not, Dr. Moore has stated his profound belief in his First Amendment right of freedom of expression. This country has come a long way from its roots if the Government is prepared to seek his incarceration for expressing that belief.[2]

Finally, and perhaps inevitably, the Government reminds the Court of Dr. Moore's prior assertion of the "sovereign citizen" defense, a position that he has long-since abandoned. The reason for the Government's mention of it is abundantly obvious. At the recent hearing on Dr. Moore's request for permission to go to Mexico for a wedding, the sovereign citizen episode was still very much on this Court's mind. It is apparently still a sore point for the Court, and the Government has gone all out in an attempt to rub salt in the wound. But when all is said and done, the Government is still just trying to punish Dr. Moore for his personal and political beliefs, both past and present.

The decision that the Court makes at tomorrow's hearing will have profound repercussions. The most obvious of them is that it will determine whether or not Dr. Moore is deprived of his liberty; but that is certainly not the only one. Perhaps most relevant to this discussion is the impact that it may have on the other parties to the litigation, and to the Court itself.

At a recent motion hearing, Judge Nielson granted the Government's motion to bar a necessity defense, which had been the heart of Dr. Moore's trial strategy. Upon the request of the defendant, Judge Nielson graciously agreed to entertain a stipulated motion that would move the trial

---

[2] The defendant will resist commenting here on the Government's apparent disdain for his taste in music. The Government apparently finds it nothing short of seditious that in one text Dr. Moore refers to the song "Take it All Back", a song that actually reached No. 1 on the alternative music chart.

back by six months to July 2024. The motion is being prepared, but has yet to be filed. In the event that Dr. Moore is incarcerated, the motion will no longer be viable, and he will not file it. He will not waive his right to a speedy trial at the cost of eight months worth of pretrial incarceration; very few people would. As important as it is for Dr. Moore's defense team to have an appropriate amount of time to prepare, his freedom is now the paramount consideration.

                                                      Respectfully submitted,

                                                      /s/ *Jeffrey A. Bronster*

                                                      JEFFREY A. BRONSTER

cc:    All Counsel of Record (via PACER)